UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ANNE GRIFFITH,

Plaintiff,

v.                                                      Civil Action No.:

CITY OF ROCKLAND,

Defendant

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Anne Griffith ("Plaintiff" or "Griffith"), by and through her

undersigned counsel, and complains against Defendant, City of Rockland ("Defendant",

"Rockland") as follows:

JURISDICTION AND PARTIES

1.      This case arises under the Pregnant Workers Fairness Act ("PWFA"), 42 U.S.C.

§§ 2000gg *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the

Maine Human Rights Act ("MHRA"), 5 M.R.S. 4551 *et seq.*, and 42 U.S.C. §1983 ("Section

1983").

2.      Anne Griffith is a United States citizen residing in the Town of Lincolnville,

County of Waldo, State of Maine.

3.      The City of Rockland is a municipality in Knox County, Maine.

4.      The City of Rockland Police Department ("Police Department") is governed by

the City of Rockland.

1

5.      The City of Rockland had over 25 employees during the time that the alleged

discrimination and retaliation occurred.

6.      This Court has subject matter jurisdiction over Plaintiff's federal and state claims

pursuant to 28 U.S.C. §§ 1331 and 1332.

7.      On or about September 13, 2024, Ms. Griffith filed a timely Complaint/Charge of

Discrimination against the City of Rockland alleging unlawful discrimination and retaliation

with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity

Commission ("EEOC").

8.      On or about March 11, 2025, Ms. Griffith filed a timely Amended Charge of

Discrimination with the MHRC and the EEOC.

9.      On or about May 19, 2025, the MHRC issued a Notice of Right to Sue with

respect to Ms. Griffith's state law claims.

10.     On or about May 21, 2025, the EEOC issued a Notice of Right to Sue with respect

to Ms. Griffith's federal law claims.

11.     Griffith has exhausted her administrative remedies with respect to all claims set

forth in this Complaint requiring administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

12.     Plaintiff requests a trial by jury for all claims and issues for which a jury is

permitted.

<u>FACTUAL ALLEGATIONS</u>

13.     Griffith was hired by Rockland on October 2, 2017.

14.     Rockland still employs Griffith.

2

15.    Wanda Harvey ("Harvey") is the Human Resources Officer for the City of Rockland.

16.    Harvey is a final policymaker for purposes of Section 1983.

17.    Timothy Carroll ("Carroll") is the Chief of Police for Rockland.

18.    Alex Gaylor is the Deputy Police Chief for Rockland.

19.    Max King ("King") is a Sergeant on the Rockland police force.

20.    Tom Luttrell ("Luttrell") is the City Manager for the City of Rockland.

21.    Luttrell is a final policymaker for purposes of Section 1983.

22.    Most recently, Griffith worked for Rockland's police department as a detective.

23.    Griffith earns $44.81 per hour.

24.    In addition to her duties for Rockland's police department, Griffith worked as a special investigator for the Maine State Police Computer Crimes Unit from December of 2021 until July of 2024.

25.    In lieu of being reimbursed for her work for the State of Maine, Griffith was given state-wide jurisdiction, a police cruiser, a gas card, and special database access. This is part of an agreement between the State and Rockland's police department.

26.    Most of Griffith's work for the Computer Crimes Unit was done remotely. She occasionally worked in-person or in the field to execute search warrants and interview victims, witnesses, and suspects.

27.    Up until about June 2024, Griffith was the only woman in Rockland's 18-person police department.

28.    Griffith performed her job in a satisfactory manner during her 7+ years of employment.

3

29.     On August 21, 2023, Griffith discovered that she was pregnant.

30.     Beginning in early September 2023, Griffith experienced severe and disabling nausea. She also experienced severe pre-partum depression and anxiety.

31.     Due to Griffith's pregnancy symptoms, she spent approximately two weeks at home and out of work.

32.     On September 13, 2023, Harvey suggested that Griffith go on intermittent FMLA leave and mailed her the related paperwork. This paperwork was sent to an old mailing address, so Griffith did not receive it for quite some time.

33.     On October 4, 2023, Griffith submitted her FMLA paperwork to her OBGYN so that she could submit it to Rockland.

34.     On October 21, 2023, Griffith's OBGYN submitted a note to Griffith's employer requesting that Griffith be placed on light duty.

35.     On November 2, 2023, Harvey informed Griffith that her FMLA paperwork still had not been submitted. Griffith informed Harvey that her OBGYN had informed her that they would sign and fax the paperwork in early October, though they had not done so.

36.     On November 3, 2023, Griffith's OBGYN completed her FMLA paperwork and Griffith submitted it to the City of Rockland.

37.     Harvey reviewed the paperwork and, after speaking with Carroll, informed Griffith that there would be plenty of administrative work to do and that Griffith would be able to continue her work as a special agent with the Computer Crimes Unit.

38.     On November 3, 2023, Griffith was placed on light duty.

39.     Griffith was placed on light duty because Rockland was transferring to a new type of firearm, which meant that employees were required to do shooting practice. Griffith's doctor

4

was concerned about lead exposure and the noise of shooting a gun and informed Griffith that she should not operate a firearm while pregnant.

40.    Carrying a firearm is a requirement for being in the field. Because Griffith could not be armed, she was placed on light duty and assigned office work.

41.    On November 13, 2023, Griffith informed King and Gaylor that she would be utilizing her FMLA to take the next two weeks off due to her disabling nausea.

42.    Griffith informed Harvey of her leave and Harvey requested an updated doctor's note.

43.    That same day, November 13, 2023, Griffith submitted a request to Carl Anderson ("Anderson"), a Rockland Fire Department employee, for a transfer of accrued sick leave because she had none remaining.

44.    The Rockland Fire Department transferred to Griffith a large quantity of banked sick leave because she had used up all of hers. Griffith used this banked sick leave during her second and third trimesters.

45.    Griffith's last day of work for the Rockland Police Department prior to giving birth was November 20, 2023.

46.    On November 20, 2023, Ms. Harvey emailed Griffith a request to submit a doctor's note for her absences.

47.    Soon after, Griffith submitted a doctor's note dated November 17, 2023.

48.    Prior to submitting her doctor's note, Griffith had spoken with King, Gaylor, and Carroll about working from home. All three supervisors were in support of Griffith's request and expressed a belief that she could be accommodated.

49.     Gaylor informed Griffith that he thought she could conduct background investigations from home, as well as collating and managing evidence.

50.     On December 8, 2023, Griffith submitted a formal email request to work from home two days per week and included a doctor's note. Griffith requested an accommodation due to her pregnancy symptoms.

51.     Griffith informed the City of Rockland that she had a secure workspace, told them about work that she could do remotely, and told them about work that she could do with the Computer Crimes Unit.

52.     In early December 2023, Carroll met with Griffith in-person and informed her that Harvey had denied her accommodation request. He told Griffith that Harvey said if she were able to work from home, everyone would want to work from home. Harvey also claimed that in the past, employees had taken advantage of working from home.

53.     Upon information and belief, Harvey, in his role as the Human Resources Officer for the City, had final policymaking authority over employee accommodations and telework determinations. Harvey's decision to deny Griffith's request for telework as a reasonable accommodation was not subject to review by any higher authority within the City and reflected a standing policy he articulated and enforced—that no city employees would be permitted to work from home under any circumstances. As such, Harvey's denial of Griffith's accommodation request constituted an official policy of the City for purposes of liability under 42 U.S.C. § 1983.

54.     Griffith's responsibilities as a detective are to investigate substantial crimes (such as sexual assault, child abuse, burglaries, and deaths), write reports and warrants, execute warrants, testify in court, collaborate with other agencies, and occasionally assist patrol officers as her time permits.

55.    Griffith's responsibilities for the Maine State Police Computer Crimes Unit are to investigate computer crimes, and to interview suspects, witnesses, and victims. Most of her work involves investigating crimes relating to digital child sexual abuse material.

56.    The only duty that Griffith would not have been able to fulfill while working remotely would be to speak with people who walk into the police station. However, she could have followed up with these people via phone call.

57.    Griffith offered to do all reviews and corrections of reports from home so that Sergeants working in person would not need to. She also volunteered to take on responsibilities from other Detectives, such as writing search warrants.

58.    While Griffith was on light duty, she was not permitted to carry a firearm. Due to department policy, this meant that Griffith was essentially desk-bound.

59.    Officers are not permitted to conduct fieldwork without carrying a firearm. This means that while on light-duty, Griffith could easily have performed her job remotely.

60.    Even without being on light duty, Griffith could have conducted the essential functions of her job remotely.

61.    One essential function of Griffith's job is to investigate criminal acts. This entails collecting surveillance videos, following up with victims, conducting interviews, writing and executing search warrants, and collecting evidence. Many of Griffith's interviews and follow ups occurred via phone call, text, or email. Many search warrants can be executed remotely, since they involve suspects' social media accounts. Griffith would need to send a search warrant to the company (i.e. Facebook) and would then digitally receive information about the account in question. It would have been simple for Griffith to do this remotely.

62.    Other functions of Griffith's include developing informants; conducting interviews of victims, witnesses, and alleged suspects; and maintaining contact and rapport with the public, court officials, other agencies' representatives, and business representatives. Griffith performed each of these duties primarily through phone, text, or email. She performed these duties daily and could do so remotely.

63.    Griffith is also required to prepare reports, which she did daily and could have done remotely.

64.    Griffith is required to confer with her supervisors, which she does daily and similarly could have done remotely.

65.    Griffith is also responsible for reviewing search warrants for patrol officers prior to their execution and does so about five times per month. This could have been done remotely.

66.    Other duties of Griffith's include detecting and arresting alleged offenders. A large part of this duty is "cyber stalking" said offenders by conducting computer research to determine who their friends are, where they work, and which places they frequent. Griffith could have detected offenders remotely but would not have been able to physically arrest offenders while on light duty or working remotely.

67.    Other essential functions of Griffith's job are to recover stolen property and procure evidence. Griffith was required to perform these duties a couple of times per year, at most. She could not have done this while on light duty or working remotely, but it is very likely that she would not have needed to.

68.    Griffith is also required to conduct overt and covert surveillance and undercover work. She performs this duty a couple of times each year, meaning that it is very rarely asked of her.

69.    The final essential duty required of Griffith is to maintain departmental equipment, supplies, and facilities. This entails keeping her cruiser clean, ensuring that her evidence collection kit is stocked, assisting with maintaining the evidence processing room, and keeping her assigned freezer clean. These duties are negligible and are not frequently asked of officers.

70.    Ultimately, Griffith could have performed her duties remotely. The essential functions that she could not fulfill remotely were duties that she performed very infrequently, meaning that it would not have been burdensome for another employee to perform these duties in Griffith's case on the slight chance that they arose while she was working remotely. Griffith also volunteered to take on additional duties not required of her in order to lighten the load of other employees who may have needed to cover for her.

71.    Defendant could have accommodated Griffith without significant burden but chose not to.

72.    On December 11, 2023, Griffith received an official denial of her accommodation request from the City of Rockland that stated "our expectation is that employees are physically present at work. We must look at fairness for all; present and future, when making decisions as an employer for its employees. Your light duty position provides support in many other functions of the daily operations of the Rockland Police Department. This support can only be obtained by being present in the office".

73.    On December 18, 2023, Griffith was given an electronic copy of the denial. In this letter, Harvey informed Griffith that the reasons for the denial were: remote work for employees for Rockland is/has not been an option, fairness for other employees, expectation of employees being physically present at work, and that her work with the CCU was secondary.

9

74.     Rockland's denial of Griffith's reasonable accommodation request is a violation of the PWFA, ADA, and MHRA.

75.     Harvey's message to Griffith demonstrates explicit violations of the PWFA and shows discriminatory animus. Harvey writes that the City had to "look at fairness for all… when making decisions as an employer for its employees" and that remote work has not been an option for any City employee. Fairness is not a consideration under the PWFA.

76.     Under the PWFA, Defendant was required to accommodate Griffith for her pregnancy-related disabilities, regardless of any other employee. In suggesting that Griffith could not work remotely because it would be unfair for other employees, Defendant fails to treat pregnancy as a worthy status under the PWFA and fails to recognize the need for pregnancy-related accommodations. This is explicitly discriminatory and in violation of the PWFA.

77.     Griffith had the right to be granted an accommodation permitting her to work in a way that met her needs, regardless of any other employees, because Griffith (and not any other employee) was pregnant.

78.     Pregnancy and pregnancy related conditions are defined as a special status requiring accommodations the PWFA and MHRA. Further, the PWFA specifically lists remote work as a reasonable accommodation and requires that employers temporarily suspend one or more essential job function in order to reasonably accommodate pregnant employees if needed.

79.     On January 12, 2024, Griffith submitted a new request for remote work. In this request, she cited information from the PWFA, ADA, and EEOC. Griffith also advised Rockland that Carroll and Gaylor were in support of her working remotely.

80.     On January 22, 2024, Griffith received a denial letter from Luttrell. He informed Griffith that the reasons for the denial were: not offering telework to any employees and that they

are not required to provide her with telework, her position is not well suited for telework, and that her current assignments cannot be done remotely.

81.    Luttrell informed Griffith that the accommodation would be "incredibly burdensome" for her and the department. He also informed Griffith that, after consideration, the Police Department would permit her to conduct background checks (on potential new hires) while at home, but he did advise that it is limited and cannot guarantee consistent/regular work.

82.    Griffith's terms of employment were changed, and she did not receive full-time hours of pay. This is a violation of the PWFA, ADA, and MHRA.

83.    It took Defendant three months to offer Griffith even this unsatisfactory accommodation, despite Griffith requesting reasonable accommodations multiple times.

84.    In the January 12, 2024, denial letter, Rockland wrote, "we are not required to provide you with remote work because the City does not offer remote work to any of its employees. Furthermore, your job as a City of Rockland Police Detective is particularly not well suited to remote work, even if it was an option".

85.    Rockland's claim that they were not required to provide Griffith with remote work is a violation of the PWFA, ADA, and MHRA.

86.    Luttrell's email demonstrates clear discriminatory animus and explicit violations of the PWFA, ADA, and MHRA.

87.    Regardless of whether or not Griffith's job was "well suited" to remote work, she had the right to work remotely as long as she could fulfill the essential functions of her role (which she could). More importantly, the PWFA states that essential functions can be temporarily modified or suspended during the period of one's pregnancy. 42 U.S.C. § 2000gg(6).

88.     Regardless, Griffith could have fulfilled the essential functions of her job without the need to suspend any.

89.     Griffith solely requested to work remotely two days per week, meaning she would be in person three days per week. She could have divided her work accordingly, fulfilling any tasks requiring her to be in-person on the days that she was in the office and fulfilling the tasks that could be done remotely on the other days of the week.

90.     In addition, Luttrell's claim that Griffith could not work remotely because none of the City's employees were permitted to work remotely is a clear violation of the PWFA, ADA, and MHRA and demonstrates discriminatory animus against pregnant employees.

91.     Luttrell, as the City Manager, is the final policymaker with respect to employment policies and practices for municipal employees, including decisions regarding telework, accommodations for employees with disabilities, and the conditions of employment generally. Acting in this policymaking capacity, the City Manager unilaterally implemented and enforced a blanket policy prohibiting all city employees from engaging in telework, without exception and without regard to individual disability-related needs or reasonable accommodation requests.

92.     This no-telework policy was not subject to approval or oversight by any other official or entity within the City government, and therefore represents the official policy of the municipality for purposes of liability under 42 U.S.C. § 1983.

93.     As stated above, Griffith is held to a different standard than other employees due to her protected status as a pregnant employee. She had the right to be accommodated, and to suggest that accommodating her would be unfair to other employees is clear pregnancy discrimination.

94.    In his January 22, 2024 letter, Luttrell informed Griffith that Defendant was obligated to attempt to accommodate Griffith in ways that permitted her to continue working prior to placing her on leave.

95.    The PWFA states that the "employer must not require an employee to accept an accommodation other than a reasonable accommodation arrived at through the interactive process" as well as that the "employer must not require an employee to take leave if another reasonable accommodation can be provided that would let the employee keep working". See 42 U.S.C. 2000gg-1.

96.    Defendant's decision to place Griffith on leave without offering any other reasonable accommodation is a violation of the PWFA.

97.    On February 2, 2024, Griffith informed Rockland that the PWFA requires that pregnancy accommodations be granted to pregnant women. She informed them that they must accommodate her and cited relevant laws.

98.    Despite being given the opportunity to do so, Defendant failed to adhere to the guidelines of the PWFA.

99.    On February 2, 2024, Griffith submitted a doctor's note stating that she cannot be physically present in the office due to the severity of her pregnancy symptoms. Griffith's doctor requested that she be permitted to work remotely.

100.    On February 6, 2024, Griffith met with Gaylor to review the list of tasks that Luttrell had cited in his denial letter. Griffith requested that Gaylor review the letter and give her his opinion on whether she could complete the tasks remotely. He advised Griffith to speak with Carroll.

101.     On February 12, 2024, Griffith met with Carroll to discuss the letter with him. Griffith explained that she wished to respond and that the letter she wrote would be to show support for her ability to work remotely and to attest that her tasks could be done remotely. Carroll informed Griffith that he would review the letter.

102.     Griffith created a detailed list of light duty assignments that she could complete and work remotely and asked Carroll to sign the letter, attesting to the fact that he believed Griffith could complete these tasks remotely.

103.     On February 20, 2024, Griffith followed up with Carroll about the letter. He informed Griffith that all work duties must go through HR.

104.     On February 27, 2024, there was a meeting between Harvey, Luttrell, Carroll, Gaylor, and Griffith's Union Representative, Joe Piccone ("Piccone"), who attended the meeting on Griffith's behalf. Ultimately, Griffith's accommodation requests were not granted during this meeting.

105.     A follow-up meeting occurred on March 6, 2024, in which Defendant informed Griffith that it did not allow its employees to work from home. This, again, is a violation of the PWFA, ADA, and MHRA.

106.     Defendant ultimately stated the same thing on three different occasions, demonstrating a clear and pervasive pattern of pregnancy discrimination.

107.     On April 18, 2024, Griffith gave birth and began her official maternity leave.

108.     In June 2024, Griffith met with Gaylor to discuss her return to work. He informed Griffith that when she returned she would be working primarily on Maine State Police Computer Crimes cases.

109.    Griffith was originally planning to return to work from maternity leave in July of 2024.

110.    Due to pregnancy and post-partum related issues, Griffith needed to extend her maternity leave.

111.    Griffith returned to work on October 1, 2024.

112.    Griffith was not paid for her full hours by Rockland from November 13, 2023, through October 1, 2024. She used paycheck insurance, sick time, and PTO but ultimately had to go on unpaid leave.

113.    Griffith's maternity leave was going to be covered by PTO and sick time, but due to Rockland's refusal to accommodate her, her maternity leave was unpaid.

114.    Shortly after her return to work, Griffith met with Gaylor and Carroll. They informed her that her contract with the Maine State Police Computer Crimes Unit had ended while she was on leave and that the City had elected not to renew it. King was also present at this meeting.

115.    This decision was surprising to Griffith, since Gaylor had told her in June of 2024 that he planned for her to work primarily on Maine State Police Computer Crimes Unit cases when she returned to work.

116.    Gaylor, Carroll, and King informed Griffith that they wanted her to focus primarily on Rockland cases and work with the City's Criminal Investigations Unit.

117.    They also informed Griffith that they would consider entering into a new contract with the Maine State Police at some point in the future. Griffith received varying dates as to when this might happen.

118.    Griffith's appointment as a Special Agent with the Maine State Police Computer Crimes Unit was considered a promotion. It is a specialty assignment that only one other person in the State of Maine holds.

119.    When Rockland refused to renew Griffith's contract with the Maine State Police, they demoted her.

120.    Griffith's contract with the Maine State Police had always been very flexible and it was stipulated that her cases for Rockland took priority.

121.    Rockland currently has three detectives working in the Criminal Crimes Unit, which has never happened before. During Griffith's employment, there were only two detectives in this unit.

122.    The Criminal Investigations Unit of the Rockland Police Department is not backlogged or understaffed. There is not a need for Griffith to focus solely on this department.

123.    Upon Ms. Griffith's return to work, the Police Department assigned her to follow up on other detectives' cases. This type of work is only assigned when there are very few cases to work on.

124.    As of the date of this court complaint, Ms. Griffith is only actively working on one case. She has previously worked on up to twenty cases.

125.    The Maine State Police Computer Crimes Unit made it clear that they wanted Griffith to continue working for them and had a need for her service. Were it up to them, they would have renewed Griffith's contract.

126.    Griffith's supervisors at the Computer Crimes Unit were very surprised that Rockland had not renewed Griffith's contract. The CCU is understaffed and in need of Griffith's help.

127.    Rockland demoted Griffith by failing to renew her contract with the Maine State Police Computer Crimes Unit. Rockland's demotion was retaliation against Griffith for requesting an accommodation and engaging in protected activity under the MHRA, ADA, and PWFA.

128.    Because the City chose not to renew her contract, Griffith no longer had State-wide jurisdiction and had to relinquish her state-issued cruiser, computers and electronics, and state issued IDs and badge. She also lost access to certain state-wide databases.

129.    After being forced to relinquish her state-issued cruiser, Griffith was without a cruiser for two weeks.

130.    Rockland then gave Griffith the oldest and worse cruiser in their fleet. Since Griffith is the most senior detective in the Police Department, she should have received the newest cruiser upon her return to work.

131.    When Griffith returned to work after maternity leave, she noticed that a lot of her equipment had been taken away from her and not replaced. This includes a computer monitor, external speakers, and a handcuff carrier.

132.    It took multiple weeks after Griffith's return to work for her equipment to be replaced.

133.    Rockland demoted Griffith when they did not renew her contract with the Maine State Police Computer Crimes Unit, took away a material benefit of her employment, and burdened her with subpar working conditions. This is retaliation under the PWFA, ADA, and MHRA.

134.    Rockland's failure to accommodate Griffith is in violation of the PWFA, the MHRA, and the ADA.

135.    Rockland treated Griffith differently and worse due to her sex, disability, and status as a pregnant woman. This is in violation of the PWFA, MHRA, and Title VII.

COUNT I: ADA – Discrimination

136.    Paragraphs 1 – 135 are incorporated by reference.

137.    Plaintiff has a disability as defined under the Americans with Disabilities Act ("ADA"), specifically severe pre-partum depression, anxiety, and debilitating nausea.

138.    Plaintiff was qualified to perform the essential functions of her position, with or without reasonable accommodation, as demonstrated by her continued employment and satisfactory job performance for over seven years.

139.    Plaintiff was subjected to adverse employment actions including denial of remote work accommodations, forced leave, reduction in responsibilities, and demotion due to her disability.

140.    Defendant's actions constitute discrimination under the ADA, in violation of 42 U.S.C. § 12112(a).

COUNT II: ADA – Failure to Accommodate.

141.    Paragraphs 1-140 are incorporated by reference.

142.    Plaintiff has a disability under the ADA.

143.    Plaintiff was qualified to perform the essential functions of her job with reasonable accommodation, specifically remote work.

144.    Defendant was aware of Plaintiff's disability and her multiple explicit requests for accommodation beginning in December 2023.

145.    Defendant repeatedly refused to provide Plaintiff with a reasonable accommodation.

146.    Defendant's refusal violates the ADA, specifically 42 U.S.C. § 12112(b)(5)(A).

COUNT III: ADA – Retaliation

147.    Paragraphs 1-146 are incorporated by reference.

148.    Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations.

149.    Plaintiff suffered adverse employment actions including termination or demotion from the Maine State Police Computer Crimes Unit, reassignment to lower-level duties, and provision of inadequate equipment upon return to work.

150.    A causal connection exists between Plaintiff's protected activity and the adverse employment actions, as evidenced by the timing and circumstances of Defendant's conduct.

151.    Defendant's conduct constitutes retaliation under the ADA, in violation of 42 U.S.C. § 12203(a).

COUNT IV – PWFA

152.    Paragraphs 1 – 151 are incorporated by reference.

153.    Plaintiff had known limitations related to pregnancy, childbirth, and related medical conditions, including severe nausea, pre-partum depression, and anxiety.

154.    Plaintiff requested reasonable accommodations related to these limitations, including remote work.

155.    Plaintiff was qualified to perform the essential functions of her job with the requested accommodation, as she successfully identified tasks she could complete remotely.

156.    Defendant denied Plaintiff's requested accommodation, despite Plaintiff providing supporting medical documentation and supervisor agreement.

157.    The PWFA allows for a pregnant worker to be considered "qualified" even if she is temporarily unable to perform an essential function of the job, provided that the inability is temporary and can be reasonably accommodated. See 42 U.S.C. § 2000gg (6).

158.    The PWFA explicitly prohibits employers from requiring a pregnant worker to take leave, whether paid or unpaid, if another reasonable accommodation can be provided. 42 U.S.C. § 2000gg–1(4).

159.    Defendant failed to demonstrate that accommodating Plaintiff would impose an undue hardship.

160.    Defendant's actions violate the Pregnant Workers Fairness Act, specifically 42 U.S.C. § 2000gg-1(1)-(4).

<u>COUNT V: PWFA – Retaliation</u>

161.    Paragraphs 1-160 are incorporated by reference.

162.    Plaintiff engaged in protected activity by requesting reasonable accommodations under the PWFA.

163.    Plaintiff suffered adverse employment actions including non-renewal of her contract with the Maine State Police Computer Crimes Unit, reassignment to lower-level duties, and inadequate provisions of workplace resources.

164.    A causal connection exists between Plaintiff's protected activity and the adverse employment actions, as demonstrated by the proximity in timing and Defendant's explicit resistance to Plaintiff's accommodation requests.

165.    Defendant's conduct constitutes retaliation under the PWFA, in violation of 42 U.S.C. § 2000gg-1(5)

## COUNT VI: MHRA – Sex Discrimination

166.    Paragraphs 1 – 165 are incorporated by reference.

167.    Plaintiff is a member of a protected class.

168.    Plaintiff was qualified for her employment position as evidenced by her seven-plus years of satisfactory employment.

169.    Plaintiff suffered adverse employment actions including denial of accommodations, forced leave, demotion, and assignment of inferior equipment and tasks upon her return.

170.    The adverse actions occurred under circumstances giving rise to an inference of discriminatory intent based on sex or pregnancy, as explicitly indicated by Defendant's repeated refusal to accommodate Plaintiff's pregnancy-related conditions.

171.    Defendant's actions violate the Maine Human Rights Act ("MHRA"), specifically 5 M.R.S. § 4572(1)(A).

## COUNT VII: MHRA – Disability Discrimination

172.    Paragraphs 1-171 are incorporated by reference.

173.    Plaintiff has a disability as defined by the MHRA, specifically pregnancy-related medical conditions causing significant impairment.

174.    Plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodation.

175.    Plaintiff was subjected to adverse employment actions including denial of accommodations, forced leave, reduced responsibilities, and demotion because of her disability.

176.    Defendant's actions constitute disability discrimination under the MHRA, violating 5 M.R.S. § 4572(1)(A).

## COUNT VIII: MHRA – Failure to Accommodate

177.    Paragraphs 1-176 are incorporated by reference.

178.    Plaintiff had a disability or pregnancy-related condition requiring accommodation.

179.    Plaintiff requested a reasonable accommodation from Defendant, specifically remote work arrangements.

180.    Plaintiff was qualified to perform the essential functions of her job with the requested accommodation.

181.    Defendant refused Plaintiff's requests for reasonable accommodation.

182.    Defendant failed to demonstrate undue hardship in providing the requested accommodations.

183.    Defendant's conduct violates the MHRA, specifically 5 M.R.S. § 4572(2).

## COUNT IX: MHRA Retaliation

184.    Paragraphs 1-183 are incorporated by reference.

185.    Plaintiff engaged in protected activity under the MHRA by requesting reasonable accommodations.

186.    Plaintiff suffered adverse employment actions including demotion, reduced responsibilities, and inadequate workplace resources.

187.    A causal connection exists between Plaintiff's protected activity and the adverse employment actions, as demonstrated by timing and Defendant's explicit and repeated refusals.

188.    Defendant's actions constitute retaliation under the MHRA, in violation of 5 M.R.S. § 4633.

<u>COUNT X: Title VII – Sex Discrimination</u>

189.    Paragraphs 1-188 are incorporated by reference.

190.    Plaintiff is a member of a protected class (sex, including pregnancy).

191.    Plaintiff was qualified for her employment position, as evidenced by her longstanding satisfactory performance.

192.    Plaintiff suffered adverse employment actions including forced leave, denial of accommodations, demotion, and inferior working conditions upon her return from maternity leave.

193.    The adverse actions occurred under circumstances giving rise to an inference of unlawful discrimination based on Plaintiff's sex or pregnancy.

194.    Defendant's actions violate Title VII of the Civil Rights Act, specifically 42 U.S.C. § 2000e-2(a).

<u>COUNT XI – Section 1983</u>

195.    Paragraphs 1 – 194 are incorporated by reference.

196.    Plaintiff is a public employee and a member of protected classes based on sex, pregnancy, and disability.

197.    Defendant, acting under color of state law, intentionally treated Plaintiff differently than similarly situated non-pregnant and non-disabled employees.

198.    Defendant's decision to deny Plaintiff reasonable accommodations, force her onto leave, demote her, reassign her to lesser tasks, and provide her with inferior equipment and conditions of employment, constitutes disparate treatment on the basis of protected class status.

199.    Defendant's actions were taken pursuant to the decision-making authority of final policymakers and high-level officials, including the City Manager, Human Resources Officer,

and Police Department leadership, and reflect the policy, practice, or custom of the City of
Rockland.

200.    The City of Rockland's repeated justification that Plaintiff could not work
remotely due to concerns about "fairness" to other employees is evidence of an official policy or
custom that failed to account for the distinct rights of pregnant and disabled employees.

201.    Luttrell, as the City Manager and a final policymaker, set a policy refusing to
consider telework as a reasonable accommodation for city employees, including employees with
disabilities, which violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et
seq*., and constituted intentional discrimination against disabled employees. Moreover, by
categorically denying disabled employees the opportunity to telework while permitting able-
bodied employees to perform their duties on-site without similar restrictions, the City Manager's
policy deprived disabled employees of the equal protection of the laws in violation of the
Fourteenth Amendment to the United States Constitution.

202.    Upon information and belief, Harvey, in his role as Human Resources Director for
the City, had final policymaking authority over employee accommodations and telework
determinations. Harvey's decision to deny Griffith's request for telework as a reasonable
accommodation was not subject to review by any higher authority within the City and reflected a
standing policy he articulated and enforced—that no city employees would be permitted to work
from home under any circumstances. As such, Harvey's denial of Griffith's accommodation
request constituted an official policy of the City for purposes of liability under 42 U.S.C. § 1983.

203.    The City's failure to renew Plaintiff's assignment with the Maine State Police
Computer Crimes Unit, despite no operational need to terminate the role and despite Plaintiff's

24

supervisors supporting her continued participation, constitutes a demotion undertaken with discriminatory purpose.

204.    The refusal to accommodate Plaintiff and the retaliatory employment actions reflect deliberate indifference to Plaintiff's constitutional right to equal protection of the laws.

205.    As a result of Defendant's actions, Plaintiff suffered damages including emotional distress, humiliation, reputational harm, and loss of pay and professional opportunities.

206.    Defendant's conduct violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and is actionable under 42 U.S.C. § 1983.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of her rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.    Order Defendant to award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.    Award equitable-relief for back pay, lost benefits, and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award enhanced compensatory damages in an amount to be determined at trial;

H.    Award liquidated damages;

I.    Award nominal damages;

J.    Award attorneys' fees, including legal expenses, and costs;

K.    Award prejudgment interest;

L.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability and/or serious health conditions;

M.      Require Defendant to mail a letter to all employees notifying them of the verdict against it and stating that Defendant will not tolerate disability discrimination in the future;

N.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendant train all management level employees on the prohibitions against discrimination in the ADA and the PWFA;

P.      Grant to Plaintiff such other and further relief as may be just and proper.

Respectfully submitted,

Dated: July 18, 2025              /s/ Martin P. Tartre
                                 Martin P. Tartre

                                 Attorney for the Plaintiff

                                 EMPLOYEE RIGHTS GROUP
                                 92 Exchange Street 2nd floor
                                 Portland, Maine 04101
                                 Tel. (207) 874-0905
                                 Fax (207) 874-0343
                                 Martin@EmployeeRightsLaw.Attorney

26